# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SAM HARGROVE, ANDRE HALL, MARCO EUSEBIO, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SLEEPY'S, LLC, <br><br> Defendant. | Civil Action No.: 10-cv-01138 (PGS) <br><br> MEMORANDUM AND ORDER |

SHERIDAN, U.S.D.J.

This matter comes before this Court on Plaintiffs' motion for class certification. [ECF No. 193].

I.

In 2010, Plaintiffs Sam Hargrove, Andre Hall, and Marco Eusebio, who were all delivery drivers for Defendants Sleepy's, LLC ("Sleepy's"), filed a complaint in this Court, on behalf of a putative class, alleging that Sleepy's misclassified them as independent contractors rather than employees, and thus denied them protections and benefits under the Employee Retirement and Income Security Act (ERISA), the Family Medical Leave Act, and the New Jersey Wage Payment Law. *Hargrove v. Sleepy's LLC*, 612 Fed. Appx. 116, 117 (2015). Specifically, Plaintiffs allege that Sleepy's withheld and diverted money from their wages in violation of New Jersey's Wage Payment Law. *Id.* Plaintiffs also allege that they were not paid overtime for their work, a claim that would also arise under the New Jersey Wage and Hour Law. *Id.*

Generally, Sleepy's is a New York-based mattress retailer that adopts a comprehensive delivery process. They operate a facility in Robbinsville, New Jersey. The only merchandise dispatched from the Robbinsville terminal is Sleepy's merchandise sold to Sleepy's customers, or transfers from the terminal to another Sleepy's facility. (Zezas Dep. 20:23-21:8.) Sleepy's runs approximately 50-60 trucks per day, and sometimes as many as 85-90 trucks during peak season out of the Robbinsville facility. (Id. at 19:15-20:22.)

According to Sleepy's, deliveries are performed by contractors. Sleepy's requires its contractors to sign Independent Driver Agreements (IDA) (See Def. Br. Ex. G, I, K, L, J, H, F, M). Pursuant to the IDA, drivers are classified as independent contractors. (EX. L (Sample IDA), IDA ¶3). The IDA provides for a non-exclusive relationship, meaning that the drivers are considered independent contractors, and may make deliveries for other companies while not performing deliveries for Sleepy's. (*See Hargrove v. Sleepy's* LLC, Civ. A No. 10-1138, 2012 EL 1067729, *1 (D.N.J. Mar. 29, 2012). Contractors and any helpers are required to wear Sleepy's uniforms and Sleepy's ID badges and display Sleepy's advertising on their trucks. (IDA ¶¶9-10.) Pursuant to the IDA, contractors pay for their own workers compensation insurance, and list Sleepy's as "certificate holder" on their policies. They also purchase motor vehicle insurance and list Sleepy's as an additional insured on their policy. (IDA ¶4.)

Drivers are also required to "agree that while performing deliveries for Sleepy's [they] will not carry merchandise for any other business until [they] finished the delivery manifest given by Sleepy's." (IDA ¶2.)

Plaintiffs contend that, between January 2007 and December 2016 (class period), Sleepy's has contracted with at least 193 individuals to perform deliveries out of its facility in Robbinsville. (Shuford Aff. ¶6 (Ex. E)).[1]

*Procedural History*

After the parties filed cross-motions for summary judgment, on March 29, 2012, this Court entered an order granting Sleepy's motion for summary judgment and denying Plaintiffs' cross-motion. *Id.* The decision was appealed and remanded by the Third Circuit who asked for the advice of the Supreme Court of New Jersey regarding which test to apply to determine the nature of an employment relationship under the New Jersey Wage Payment Law and the New Jersey Wage and Hour law. The Supreme Court deemed the "ABC test" to be most appropriate. *Id.* On remand, this Court granted Plaintiffs' motion for partial summary judgment and denied Sleepy's motion for summary judgment. In the decision, this Court applied the New Jersey Supreme Court ABC test, to determine whether Plaintiffs were to be considered employees. *Hargrove v. Sleepy's, LLC*, 2016 U.S. Dist. LEXIS 156697, *12 (D.N.J. Oct. 25, 2016).

Following the remand, Plaintiffs voluntarily dismissed Count 8, 9, 10, and 11, which arose under the laws of Massachusetts, New York, Connecticut, and Maryland. However, the following claims remain: Breach of Contract (Count I and II); Mistake (Count III); Rescission (Count IV); Claim for Plan Enforcement under the Employee Retirement and Income Security Act (ERISA) (Count V); Violations of the Family and Medical Leave Act (FMLA) (Count VI); Violations of New Jersey Wage Payment Law (NJWPL) (Count VII); and violations of New Jersey Wage and

---

[1] In its brief, Defendant argues that the Shuford Affidavit should be stricken because it was not identified in Plaintiffs' Rule 26 (a)(1) disclosure. (Def. Opp. Pg. 25).

Hour law (Count VIII). Plaintiffs now seek certification of the class pursuant to Fed. R. Civ. P. 23.

As this Court understands it, the proposed class members would have to meet three criteria that define the class: (1) worked full-time making deliveries for Sleepy's and thus were misclassified as independent contractors; (2) were subject to improper deductions; and (3) worked over 40 hours per week without being paid over-time (time-and-a-half).

On December 13, 2017, the Court held oral argument on the motion for class certification. There, Plaintiffs supported determining that "at least 193" people met the criteria for the class proposed, as specified in the affidavit of Rebecca Shuford, the paralegal who analyzed the data and documents to determine the proposed class. [ECF 193-5, Shuford Affidavit]. Ms. Shuford submitted two affidavits which listed the documents she reviewed and her findings. The only difference between the affidavits is that, at request of Plaintiffs' attorney, Ms. Shuford expanded on the number of trucks operated by contractors that she deemed part of the proposed class. (Shuford Depo., ECF 211-1, T30-21-31:15). Specifically, Ms. Shuford noted that 201 contractors were listed on Sleepy's documents. After eliminating eight contractors who operated 10 or more trucks simultaneously, she counted 193 contracts total. (ECF 196-10 2nd Shuford Affidavit ¶3).

> Of the 193 contractors that I identified, 73 contractors operated only 1 truck for Sleepy's and an additional 12 contractors operated only 1 truck in the majority of the weekends they made Sleepy's delivery [55] contractors averaged operating 2 trucks while working for Sleepy's. [29] contractors averaged operating 3 trucks for Sleepy's. The remaining 24 contractors averaged between 4 and 9 trucks per week.

(Id. ¶4).

At the hearing, the Court requested clarification as to the methodology used by Plaintiff to determine the proposed class members. The Court also provided the parties with the option to

depose Ms. Shuford which they did on December 20, 2017. Thereafter, parties submitted supplemental briefs for consideration by this Court. [ECF No. 208 and ECF No. 211].

*Ms. Shuford's Deposition*

Ms. Shuford is currently employed by Plaintiff's firm as a paralegal. She has been working as a paralegal since 2015 and was trained within the firm. At the time of the deposition, she did not hold a certificate of training as a paralegal. (T 15-16). At the deposition, Ms. Shuford confirmed that she reached the conclusions mentioned in her affidavit by reviewing three sets of records:

1. The Outside Carrier Expense Detail reports (Bates No. SL0021713-29781) produced by Sleepy's for all trucks making deliveries out of Sleepy's Robbinsville, New Jersey facility from January 1, 2007 to 2010;

2. Outside Carrier Spreadsheets, containing data for payments and deductions made to carriers operating out of the Robbinsville facility from 2011 thought 2016, that were produced by Paul Lantis. (T19:17-23; respectively Ex. 1 (sample report) and Ex 2 (email from Lantis) to Shuford Affidavit); and

3. Gate logs (3,400 pages), however, Ms. Shuford noted that they only cover a time period in 2008-2009. (T45).

There are three main points that seek resolution through exploring Ms. Shuford's review of the data and conclusions as to the class size: (1) how to determine which drivers provided delivery services for Sleepy's on a full-time basis; (2) who was subject to improper wage deductions; and (3) who failed to receive over-time pay when working more than 40 hours per week.

a. *Number of Full-Time Drivers*

When asked how she reached the number 193 for the class size, from the documents she reviewed, Ms. Shuford answered in a convoluted manner as follows:

> If you look at the top of the page, you will see that there is – the very top line says vendor number. Then pay week. If you drop down a little bit, it says truck number. Then has a date, total stops, total made, auto rata, et cetera. So vendor number is blank here, because it is in the middle of the time range. The conclusion being that when looking outside carrier expense derails it tells us, number one, in any given period of time, the amount of money that Sleepy's was paying a particular carrier and also shows the trucks the carrier used in that period of time.

(T23:8-14). In addition, the outside carrier expense detail also shows any deductions made because of an issue with a particular delivery and bonuses. (T 23:15-24:6). Ms. Shuford disclosed that from the documents she reviewed, she could not tell whether the vendors made deliveries for other companies other than Sleepy's.

b. *Improper wage deductions*

With regard to improper deduction, Defendant's counsel asked,

> Q. Nothing in the data referred to in paragraph two tells you whether a carrier passed on any of the deductions referred to in the outside carrier expense details to any particular individual; correct?
>
> A. That's correct.

(T27:2-7). Ms. Shuford summarized the findings as to deductions in a chart, Exhibit 23 of her affidavit. To create the chart, Ms. Shuford "added all the deductions taken from the companies associated or the vendor numbers associated with our individual plaintiff. So, for example, all the deductions that were taken from a [truck labeled] "5AH" and then after talking to the attorneys put them into some rough categories, which were explained in the box below and then totaled up." (T27:23-28:5).

Looking at the last page of the exhibit, using the example of Marco Eusebio, Defendant's counsel pointed to an amount listed as the deductions withheld by Sleepy's and noted, with Ms. Shuford's corroboration, that there is no way of knowing "whether Marco Eusebio reacted to those deductions by taking money out of the wages that his carrier paid him," nor is there a way of knowing how he dealt with the deduction. (T29:1-19).

c. *Over-time Pay*

Counsel also questioned Ms. Shuford regarding her method of ascertaining whether members of the proposed class were not paid for over-time hours they worked:

> Q. When returning to the subject of the data that you reviewed and that you referred to in paragraph two nothing in that data tells you whether a particular carrier paid its employee hourly or on a flat-fee basis; correct?
>
> A. No. It only shows what Sleepy's paid to the contractor.

(T26:11-22).

d. *Overall class determination*

When asked how she determined "how many of the 193 people in your affidavit actually performed delivery services personally" Ms. Shuford stated,

> I would look the outside carrier expense detail sheets again to see what days every truck was running. Then I would take the days and look for those gate logs to see who was in the truck on the day the truck was running. And possibly also look at the roster if I was having trouble with the gate logs for whatever reason to see other contemporaneous records.

(T44:11-24). She defined it as "pretty much a simple job of just matching." (T45:2-4).

II.

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (citing *Califano v. Yamasaki*, 442 U.S. 682, 700–701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)). In

7

order to meet the requirements of this exception, a party moving to represent a class "must affirmatively demonstrate his compliance with Rule 23." *Wal–Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551–2552 (2011). The Third Circuit has emphasized that "actual, not presumed, conformance with Rule 23 requirements is essential." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3d Cir. 2012). "The party seeking certification bears the burden of establishing each element of Rule 23 by a preponderance of the evidence." *Id.*

To meet this burden, Plaintiff must satisfy the four prerequisites of Rule 23(a) and show that the action can be maintained under at least one of the three subsections of Rule 23(b). *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 183 (3d Cir. 2001). These four requirements under Rule 23(a) are referred to as numerosity, commonality, typicality, and adequate representation. *Id.* The requirements are "meant to assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances." *Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994).

a. **Numerosity**

To begin, a proper class certification requires a finding of numerosity. Meaning that the putative class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Third Circuit has said that, "[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been bet." *Gonzalez v. Corning*, 317 F.R.D. 443, 489 (D.N.J. 2016) (*citing Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir.2001)). Critically, numerosity—like all Rule 23 requirements—must be proven by a preponderance of the evidence. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008).

### b. Commonality

Second, the district court must find commonality, or that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality does not require an identity of claims or facts among class members; instead, "the commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *In re the Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 310 (3d Cir. 1998); *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). "[T]h[e] bar is not a high one." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013)

### c. Typicality

Third, in a properly certified class, the claims of the class representatives must be typical of the class as a whole. *See Prudential*, 148 F.3d at 310. In considering the typicality issue, the district court must determine whether "the named plaintiff[s'] individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985) (internal quotations omitted). This criteria does not require that all putative class members share identical claims. Indeed, so long as "the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Newton*, 2001 WL 877524, at *17 (citing *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 141 (3d Cir. 1998)); *Baby Neal*, 43 F.3d at 58 ("Commentators have noted that cases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims.").

### d. Adequacy of Representation

Fourth, class representatives must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In analyzing this criteria, the court must determine whether the representatives' interests conflict with those of the class and whether the class attorney is capable of representing the class. *See Amchem Prods v. Windsor*, 521 U.S. 591, 625-26, 117 S. Ct. 2231, 2250-51; *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 & n.13, 102 S. Ct. 2364, 2371 & n.13, 72 L. Ed. 2d 740 (1982).

### e. Predominance and Superiority

Class certification must also satisfy the requirements of Rule 23(b), specifically here, the predominance and superiority requirements of Rule 23(b)(3). Predominance requires "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Superiority mandates that the district court determine that the class action is the best method of fairly and efficiently resolving the controversy. *Id.* To assist the court in analyzing cases for predominance and superiority, Rule 23(b)(3) includes a nonexclusive list of relevant factors to consider: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. *Id.* Overall, "issues common to the class must predominate over individual issues, and the class action device must be superior to other means of handling the litigation." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 186 (3d Cir. 2001).

In the Third Circuit, we look beyond the pleadings at the class certification stage of litigation. "[I]n reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." *Newton*, 259 F.3d at 168. Class certification is proper only after a "rigorous analysis" that all prerequisites of Rule 23 are met. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008) (quoting *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

In assessing whether a plaintiff has satisfied its burden, the district court "cannot be bashful" and must resolve all factual and legal disputes relevant to class certification, including disputes touching on the elements of the causes of action, and the merits of a claim. *Gonzalez v. Corning*, 317 F.R.D. 443, 489 (D.N.J. 2016) (citing *Reyes v. Netdeposit, LLC*, 802 F.3d 469, 484 (3d Cir. 2015)).

The Court of Appeals for the Third Circuit recently set forth the District court's duty in ruling on a motion to certify a class by stating that "it is now clear that the District Court must: (1) conduct rigorous analysis, (2) review all avenues of inquiry in which it may have doubts (even if it requires reviewing the merits), (3) be satisfied and (4) make a definitive determination on the requirements of Rule 23, or even (5) require that a plaintiff demonstrate actual, not presumed conformance with Rule 23 requirements." *Id.* (*citing Reyes*, 802 F.3d at 485). Plaintiffs, however, need not establish the validity of their claims at the class certification stage. *Id.*

In this case, Plaintiffs seek certification pursuant to Rule 23(b)(3), which requires that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *Johnston*, 265 F.3d at 184.

# III.

In reviewing the application, Plaintiffs face a major hurdle in assessing the ascertainability of the proposed class size and consequently all other requirements to certify the class. As in this case, "a plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 162 (3d Cir. 2015). "Ascertainability functions as a necessary prerequisite (or implicit requirement) because it allows a trial court effectively to evaluate the explicit requirements of Rule 23. In other words, the independent ascertainability inquiry ensures that a proposed class will actually function as a class." Id.

> The ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is "defined with reference to objective criteria"; and (2) there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." The ascertainability requirement consists of nothing more than these two inquiries. And it does not mean that a plaintiff must be able to identify all class members at class certification—instead, a plaintiff need only show that "class members can be identified."

*Byrd*, 784 F.3d at 163 (3d Cir. 2015), (internal citations omitted).[2] In *Marcus v. BMW of N. Am. LLC*, the Third Circuit held that, "[i]f class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012). In those circumstances, the Third Circuit allowed "the plaintiffs to 'offer some reliable and administratively feasible alternative that would permit the court to determine' whether the class was ascertainable." *Byrd*, 784 F.3d at 164 (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d at 355.).

---

[2] *See also Marcus v. BMW of North America, LLC,* 687 F.3d 583, 83 Fed. R. Serv. 3d 246 (3d Cir. 2012), *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 86 Fed. R. Serv. 3d 192 (3d Cir. 2013), *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013) and *Grandalski v. Quest Diagnostics Inc.*, 767 F.3d 175 (3d Cir. 2014) (analyzing the requirement of ascertainability).

Plaintiffs propose at least 193 individuals as class size. This number did not include eight contractors who operated ten or more trucks at a time. Plaintiffs reached that number by looking at the individuals Sleepy's contracted with between January 2007 and December 2016 at the Robbinsville facility. (Shuford Aff. At 6 (Ex. E)). Specifically, the number was reached by looking at Outside Carrier Expense Detail reports (Bates No. SL0021713-29781) produced by Sleepy's for all trucks making deliveries out of Sleepy's Robbinsville, New Jersey facility from January 1, 2005 to 2010 and Outside Carrier Spreadsheets produced by Paul Lantis. (Shuford Depo. T19:17-23).

Defendant argues that the Plaintiffs cannot determine which putative class members meet the same criteria that Plaintiffs proposed, i.e. who worked on a full-time basis, who did not receive overtime pay, and who was subject to company deductions solely based on the documents they reviewed. (Def. Opp. pg. 13/ Def. Supp. Brief pg. 2-5). The Court explored this matter at oral argument, where Plaintiffs' counsel was asked to aid in a step-by-step analysis of each document submitted in support of this motion. At the time, Plaintiffs' counsel admitted that the documents provided in support of the motion did not match and show the suitability of any particular contractor to be a member of the class. Finding the explanation unclear, the Court allowed the parties to depose Ms. Shuford in order to understand her work product and conclusions.

Subsequently, the Court reviewed the parties' supplemental briefs and the transcripts of the Shuford deposition, in order to better understand the methodology behind the proposed class. Plaintiffs support that the members of the class are easily identified by looking at Sleepy's driver rosters, gate logs, and pay statements. Defendant acknowledges those records identify the drivers; but those documents do not provide sufficient information to make the substantive determinations under each cause of action.

First, all members of the class worked "full-time" for Sleepy's. In order to ascertain the hours worked by the contractors, Ms. Shuford proposed reviewing gate logs and documents that reflect the dates and times an individual entered and departed from the Robbinsville facility. She testified that looking at the data provided in the outside carrier expense detail, as for example in Bates SL0021743, one can find the vendor number, week, the truck number, the total number of stops made, auto rate and other information. (T22:4-8). Ms. Shuford supports, "[b]y looking at all the different vendor numbers, she made a list of all the different vendor numbers and she used that . . . to determine how many people were making deliveries for Sleepy's" (T23:3-7). The document also shows the amount paid, lists the deduction, and bonuses. However, to determine the specific driver, since many of the carriers had multiple drivers, one would have to look at "gate logs, if we had them, for that time period to find that date and look to see" what driver was listed with each truck. Ms. Shuford also states that she could "look at the driver roster ... which would list various trucks with their various drivers or helpers that were on those trucks as well." (T36:9-18). The issue with this strategy is that the gate logs are not fully completed. Sometimes the time a truck entered the facility (time-in) and the time it left the facility (time-out) was not recorded. As a result, there are gaps in listing time-in or time-out of the facility for the trucks and the drivers. Ms. Shuford acknowledged in her deposition that when the data is not there, there is no way of precisely determining what the time-in or out was for any given person. One could make an assumption, but "there is no certainty." (T48). Another issue is that Plaintiffs only have gate logs for 2008 and 2009. At this time, there is no way of verifying whether there are gaps in the gate logs similar to the gaps in 2008 and 2009 for the entire class period; and if gaps exist, the extensiveness of such gaps. Ms. Shuford has not proposed an alternative strategy to identifying each driver other than cross-referencing the gate logs and the rosters. (T47:11-13).

14

Next, with regard to over-time pay, Defendant notes, and Ms. Shuford agreed, that there is no way of knowing whether the carrier paid drivers overtime. Nor, whether any carrier reduced any drivers pay by deducting Sleepy's listed deductions. Thus, the methodology provided by Plaintiffs only fits contractors with only one driver, or 73 contractors as identified by Ms. Shuford, assuming Plaintiffs are able to gather records for the proposed relevant period, identified as 2007-2016.

Overall, notwithstanding the additional information provided by Ms. Shuford's deposition, the Court is still unable to resolve all disputes regarding the definition of this class. There are "gaps" in the record provided, as Ms. Shuford recognized, that would make assessing the size, as proposed by the Plaintiff, tenuous or speculative. While the standard for ascertainability does not mandate identification of all class members at certification, Plaintiffs still must show how the class members can be identified. *Byrd*, 784 F.3d at 163 (3d Cir. 2015). Here, identifying the members of this class would require specific fact-finding as to each individual. Thus, at this time, based on the information provided, the Court is unable to grant Plaintiffs' motion for class certification.

## *CONCLUSION*

Plaintiff's motion for class certification is denied without prejudice.

ORDER

This matter, having been brought before the Court on Plaintiff's motion for class certification [ECF No. 193], and the Court having considered the briefs and submissions of the parties; and having heard oral argument; and for good cause having been shown;

IT IS on this 28th day of February, 2018;

ORDERED that Plaintiffs' motion for class certification (ECF No. 193) is DENIED.

_____
PETER G. SHERIDAN, U.S.D.J.