# UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

―――――――

No. 19-2809

―――――――

### SAM HARGROVE; ANDRE HALL; MARCO EUSEBIO,
individually and on behalf of all others similarly situated,
Appellants

v.

### SLEEPY'S LLC

v.

### I STEALTH LLC; EUSEBIO'S TRUCKING CORP.; CURVA TRUCKING LLC

―――――――

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 3-10-cv-01138)
District Judge: Honorable Peter G. Sheridan

―――――――

Argued May 27, 2020

Before: AMBRO, HARDIMAN, and RESTREPO, <u>Circuit Judges</u>

## <u>JUDGMENT</u>

This cause came on to be heard on the record before the United States District
Court for the District of New Jersey and was argued on May 27, 2020.

On consideration whereof, IT IS ORDERED AND ADJUDGED by this Court that
the judgment of the District Court entered August 1, 2019, is hereby reversed and
remanded.  Costs taxed against Appellee.  All of the above in accordance with the
opinion of this Court.

ATTEST:

s/Patricia S. Dodszuweit
Clerk

Dated: September 9, 2020

Certified as a true copy and issued in lieu
of a formal mandate on October 14, 2020

Teste: _Patricia A Dodszuweit_

**Clerk, U.S. Court of Appeals for the Third Circuit**

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 19-2809

———————

SAM HARGROVE; ANDRE HALL; MARCO EUSEBIO,
individually and on behalf of all others similarly situated,
Appellants

v.

SLEEPY'S LLC

v.

I STEALTH LLC; EUSEBIO'S TRUCKING CORP.;
CURVA TRUCKING LLC

———————

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 3-10-cv-01138)
District Judge: Honorable Peter G. Sheridan

———————

Argued May 27, 2020

Before: AMBRO, HARDIMAN, and RESTREPO, <u>Circuit Judges</u>

(Opinion filed September 9, 2020)

Harold L. Lichten (Argued)
Benjamin J. Weber
Lichten & Liss-Riordan
729 Boylston Street, Suite 2000
Boston, MA  02116


Anthony L. Marchetti, Jr.
317 Delsea Drive
Sewell, NJ  08080

        Counsel for Appellants

Marc Esterow
Theo E.M. Gould
Matthew J. Hank (Argued)
Paul C. Lantis
Jonathan L. Shaw
Littler Mendelson
1601 Cherry Street
Three Parkway, Suite 1400
Philadelphia, PA  19102

        Counsel for Appellee

Peter Winebrake
Winebrake & Santillo LLC
715 Twinning Road

Twinning Office Center, Suite 211
Dresher, PA  19025

> Counsel for Amicus Appellants
> The National Employment Law Project and
> Towards Justice

Adam G. Unikowsky
Jenner & Block
1099 New York Avenue, N.W., Suite 900
Washington, DC  20001

> Counsel for Amicus Appellees
> Chamber of Commerce of the United States of
> America and New Jersey Civil Justice Institute

———————

## OPINION  OF  THE  COURT

———————

AMBRO, <u>Circuit Judge</u>

We review the District Court's denial of a renewed motion for certification of a proposed class of drivers who performed deliveries on a full-time basis using one truck for mattress retailer Sleepy's LLC.  The Court held that the class was not ascertainable.  *Hargrove v. Sleepy's LLC*, No. 10-cv-01138, 2019 WL 8881823, at \*5–7 (D.N.J. May 9, 2019) ("*Hargrove II*").  In addition to all the other requirements for class actions in Federal Rule of Civil Procedure 23, our Court

3

requires that a Rule 23(b)(3) class also be "currently and readily ascertainable." *Marcus v. BMW of N. Am. LLC*, 687 F.3d 583, 593 (3d Cir. 2012).[1] Plaintiffs must show that "(1) the class is defined with reference to objective criteria; and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (internal quotation marks omitted).

We reverse the District Court's order. First, the Court should not have treated the renewed motion for class

---

[1] Every putative class action must satisfy the requirements of Rule 23(a) and the requirements of Rule 23(b)(1), (2), or (3). *See* Fed. R. Civ. P. 23(a)–(b). To satisfy Rule 23(a),

> (1) the class must be "so numerous that joinder of all members is impracticable" (numerosity); (2) there must be "questions of law or fact common to the class" (commonality); (3) "the claims or defenses of the representative parties" must be "typical of the claims or defenses of the class" (typicality); and (4) the named plaintiffs must "fairly and adequately protect the interests of the class" (adequacy of representation, or simply adequacy).

*In re Cmty. Bank of N. Va.*, 622 F.3d 275, 291 (3d Cir. 2010) (quoting Fed. R. Civ. P. 23). Additionally, Rule 23(b)(3), relevant here, "requires that (i) common questions of law or fact predominate (predominance), and (ii) the class action is the superior method for adjudication (superiority)." *Id.*

certification as a motion for reconsideration. "An order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(l)(C). Courts cannot graft onto that provision the heightened motion-for-reconsideration standard requiring that, in addition to satisfying the typical Rule 23 criteria, plaintiffs show there was a change in controlling law, new evidence, or a clear error. *See Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). District courts should treat renewed motions for class certification as they would initial motions under Rule 23. *Cf. In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 73 (2d Cir. 2007).

Second, the District Court misapplied our ascertainability case law. It was too exacting and essentially demanded that Appellants identify the class members at the certification stage. We have held that a plaintiff need not "be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members can be identified.'" *Byrd*, 784 F.3d at 163 (emphasis omitted) (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 308 n.2 (3d Cir. 2013)). Appellants have met that requirement. They submitted thousands of pages of contracts, driver rosters, security gate logs, and pay statements, as well as testimony from a dozen class members stating they were required to work exclusively for Sleepy's full-time. "Affidavits, in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard." *City Select Auto Sales Inc. v. BMW of N. Am. Inc.*, 867 F.3d 434, 441 (3d Cir. 2017).

The Court focused on gaps in the records kept and produced by Sleepy's. But where an employer's lack of

records makes it more difficult to ascertain members of an otherwise objectively verifiable class, the employees who make up that class should not bear the cost of the employer's faulty record keeping. To hold otherwise is in tension with the Supreme Court's decisions in *Anderson v. Mt. Clemens Pottery Co.*, and *Tyson Foods, Inc. v. Bouaphakeo*, which held that employees bringing wage claims can meet their burdens of proof by "produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1040 (2016) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). Such inferences are necessary "to fill an evidentiary gap created by the employer's failure to keep adequate records." *Id.* at 1047. We extend *Tyson Foods* and *Mt. Clemens* to the ascertainability determination at the class-certification stage and hold that where an employer has failed to keep records it was required to keep by law, employees can prove ascertainability by producing "sufficient evidence" to define their proposed class as "a matter of just and reasonable inference." *Tyson Foods*, 136 S. Ct. at 1046–47 (quoting *Mt. Clemens*, 328 U.S. at 687).

## I.     BACKGROUND

### A.     Factual Background

#### 1.     Sleepy's Delivery Services and the Proposed Class

Sleepy's was a New York-based mattress retailer.[2] Deliveries were "an integral part of its business," J.A. 78, and

---

[2] Mattress Firm acquired Sleepy's in December 2015.

so it created a comprehensive delivery process to meet its customer needs. Sleepy's operated a large warehouse in Robbinsville, New Jersey, that it used to deliver mattresses. It ran 50 to 60 trucks daily, and as many as 85 to 90 each day during peak season.

Appellants (the three named plaintiffs in this proposed class action) are individuals who performed mattress deliveries for Sleepy's. To work for Sleepy's, they had to sign a standardized Independent Driver Agreement ("IDA"). Each IDA "required that the deliverers could not perform any other business while on duty with Sleepy's." J.A. 76. It states that drivers are required to "agree that while performing deliveries for Sleepy's [they] will not carry merchandise for any other business until [they] have finished the delivery manifest given to [them] by Sleepy's." J.A. 1030. However, the IDAs also state that the relationship was entered on a "non-exclusive basis" and that on any day Sleepy's did not have to request, and no carrier had to provide, delivery services for it. *Id.* Sleepy's enforced these provisions; in at least one instance, it penalized a driver because he made a delivery for another business while he was delivering Sleepy's product.

Some drivers in the proposed class signed IDAs on their own behalf and others signed on behalf of their corporate entity or "carrier." Appellants testified that individual drivers were required to form business entities as a condition of their employment with Sleepy's. This was true even if the business entity consisted of one driver and one truck. Appellants testified that, although there were some drivers who owned or operated two or three trucks at a time, most proposed class members operated one truck for significant stretches of time. Several drivers who operated more than one truck testified that

they drove one of their trucks full time, and a relative or an associate drove the other.

Sleepy's emphasizes that the IDA did not obligate it to pay wages to a carrier's individual owners or workers. It paid each carrier for all the deliveries the carrier performed as a whole.[3] Sleepy's also points out that, where carriers were not

---

[3] One of the key factual disputes in this case is whether Sleepy's had relationships with the drivers individually or with the corporate entities with which the drivers were affiliated. Sleepy's points us to evidence that the IDAs were signed on behalf of, and payments were made to, the corporate entities. The proposed class members counter that they only formed those entities as a condition of working for Sleepy's.

Amici—the National Employment Law Project ("NELP") and Toward Justice—support Appellants' argument and posit that the use of LLCs to misclassify employees is a widespread public policy problem.

> [S]ome employers . . . require workers to form limited liability corporations . . . , individual franchises, or other shell businesses to get a job, even where they are clearly employees . . . . [T]he employer contracts with the workers in their capacity as 'owners' or 'partners' of the shell company in order to avoid liability under labor and employment laws. Companies like the LLC model because there are fewer reporting requirements under tax laws, making it harder to identify independent contractor misclassification.

Amicus Curiae Br. of NELP 8–9 (footnote omitted).

one-person limited liability companies ("LLCs"), their owners did not necessarily drive the truck, and that there were signers to IDAs who did not provide delivery services to Sleepy's on a full-time basis.

Appellants brought an employee misclassification suit and sought certification as a class of Sleepy's delivery drivers. They alleged that Sleepy's misclassified them as independent contractors; because they are actually employees of Sleepy's, it violated the New Jersey Wage Payment Law, N.J. Stat. Ann. § 34:11–4.1 et seq., by making deductions from their pay for, among other things, damage claims, uniforms, customer claims, and other fines. Also, Sleepy's allegedly violated the New Jersey Wage and Hour Law, N.J. Stat. Ann. § 34:11-56a et seq., by failing to pay Appellants overtime when they worked more than 40 hours in a week.

## 2.    Sleepy's Records

Sleepy's maintained driver rosters that listed an identification code for each driver, how many trucks that driver was authorized to drive for it, and whom it authorized to drive each truck. The driver identification codes were used by Sleepy's computer software system to design daily delivery routes and assign those routes to a specific truck, including the approved driver for that truck.

Sleepy's also produced load sheets and manifests for each truck that listed the products to be delivered and listed the driver of that truck. Drivers had to provide their cell phone numbers so that they could be called during delivery. Their numbers appeared on the manifests. Sleepy's assigned each driver a two or three letter code (*e.g.*, "5HC" for Henderson

Clarke, or "5STT" for Sam Hargrove).  J.A. 1123–24.  If a driver operated more than one truck, Sleepy's assigned an additional number after the letter code.  Typical was Plaintiff Marco Eusebio, whose driver code was "5ETC."  J.A. 1123. At times he operated three trucks for Sleepy's, and his secondary trucks were assigned the codes "5ETC2" and "5ETC3."  *Id.*  The driver roster can thus be used to link each truck to a particular driver.

Sleepy's also generated in digital form "Outside Carrier Expense Detail" reports for each driver.  These display the driver's identifier (which is identical to the driver identification assigned to the driver on the driver rosters), the number of deliveries assigned to the driver each day, the number of deliveries completed each day, the amounts paid, and the amounts and reason for any deductions from the driver's pay.

Each driver also was required to sign in at a security gate when he arrived at the Sleepy's facility in Robbinsville. The gate logs were maintained by the security guard and listed the driver's identification, the time he arrived, his name, and, if the driver had a helper, his name.

### 3. Appellants' Methods for Ascertaining Class Members

In seeking class certification, Appellants argued they could piece together who the proposed class members were from Sleepy's available records.  Appellants' counsel reviewed the driver rosters, pay statements, and gate logs that Sleepy's produced in discovery and concluded that during the applicable class period, from 2007 to 2016, approximately 193 individuals were hired by Sleepy's to perform deliveries in

New Jersey and personally performed deliveries on a full-time basis. Of those, 111 individuals operated only one truck for at least six months during that period. Twelve of the currently proposed class members operated only one truck for at least six months for Sleepy's.

Appellants posit that their class can thus be identified by lining up the Outside Carrier Expense Detail reports, which show the days a driver performed deliveries by their assigned identification code, with the gate logs for corresponding dates, which show who was the driver for the truck that day. They included samples of those documents for six proposed class members, packaging their gate logs, driver rosters, and pay statements for the same days, which taken together show that those drivers performed multiple deliveries for Sleepy's on days they signed in at the gate.

For example, Appellants compared the relevant documents, specifically the gate logs and the pay statements, for named plaintiff Sam Hargrove, with his testimony, to show it corroborated that he worked full-time for Sleepy's, performing many deliveries per day, five to six days a week. From June 19, 2008 to November 1, 2008, the pay statements showed that Hargrove operated one truck for Sleepy's and was paid for deliveries performed on 69 days during that period. The gate logs for ten of those days are admittedly missing and another driver filled in for Hargrove on two days. Appellants posit that this process of lining up documents can be replicated for each proposed class member.

Sleepy's counters that there are substantial gaps in the record that foreclose class certification. For example, it argues that most of the documents on which Appellants rely are from

a small window in 2008–2009, and that these documents cannot support certification for the proposed class period from 2007 to 2016. It claims as well that it made a broad range of documents available, but that Appellants' counsel only copied a narrow subset. The parties engaged in discovery in 2010 and 2011. Sleepy's produced Outside Carrier Expense Detail reports for all carriers making deliveries from 2007 to 2010. It also provided access to all the gate logs it had. Sleepy's concedes that the gate logs, "if completed properly," "would reflect the date and time an individual entered and departed from the Robbinsville facility." Sleepy's Br. 8 (citing J.A. 1000). During a second round of discovery, Sleepy's produced additional data regarding payments and deductions made to carriers from 2011 through 2016.

Appellants counter that they provided evidence outside of the 2008–2009 period. Included was testimony from multiple members of the putative class who claim they had to sign in on the gate logs every morning during the entire class period. Moreover, Sleepy's has suggested that it had, or was trying to obtain, gate logs spanning from 2008 to 2016. As for the claim that only a narrow range of documents were copied, Appellants posit that, when their counsel went to Sleepy's facility to examine the logs, they were in hard-copy form and counsel were not permitted to take the documents out of the facility or to stay beyond 6:00 p.m. Nonetheless they were able to scan thousands of pages of gate logs that are in evidence. The parties dispute the significance of these gaps in the record. Whether they foreclose class certification is a question before us.

### B.    Procedural Background

#### 1. Filing of the Class Action and Ruling on the Merits

Appellants filed their class action complaint in March 2010.  After preliminary discovery, the District Court granted Sleepy's motion for summary judgment, holding that, under then-controlling New Jersey law, the drivers were independent contractors and not employees.  Appellants appealed to us, and in May 2015 we vacated and remanded so that the District Court could apply the proper test adopted by the New Jersey Supreme Court in response to a certified question from us. *Hargrove v. Sleepy's, LLC*, 106 A.3d 449 (N.J. 2015).

On remand, the parties filed partial cross-motions for summary judgment on whether the named plaintiffs were employees or independent contractors.  The District Court granted Appellants' motion and denied Sleepy's motion, holding that the three named plaintiffs were employees of Sleepy's.  Specifically, it held that Sleepy's exercised considerable control over the work of the drivers under the IDAs; they performed deliveries within Sleepy's usual course of business; by reporting to and working in the Robbinsville facility each morning and performing deliveries on routes designed by Sleepy's, the drivers worked in Sleepy's places of business; and they could not operate independent businesses because Sleepy's required them to work full-time and their IDAs barred them from performing deliveries for other businesses.

Thus the District Court has already held on summary judgment that the named plaintiffs—Samuel Hargrove, Andre

Hall, and Marco Eusebio—were misclassified as independent contractors and instead are employees of Sleepy's. The issues of class certification and damages were not decided.

## 2.    The First Motion to Certify

Appellants thereafter filed their first motion for class certification for a proposed class of 193 individuals who contracted with Sleepy's and performed deliveries on a full-time basis. They argued the class was ascertainable because all of the class members signed contracts with Sleepy's, were listed on the driver rosters, were identified on the daily delivery manifests, all signed in with a Sleepy's security guard in a gate log each morning, all of the deductions Sleepy's took from the drivers' pay were listed in their pay statements, and Sleepy's kept track of each driver's deliveries using scanner data. Appellants also produced testimony showing that Sleepy's assigned drivers a full shift of work each day and prohibited any driver from making deliveries for other businesses while making deliveries for it, so that, as a practical matter, the drivers could only work exclusively for Sleepy's.

In February 2018, however, the District Court denied Appellants' motion without prejudice. *Hargrove v. Sleepy's, LLC*, No. 10-cv-01138, 2018 WL 1092457 (D.N.J. Feb. 28, 2018) ("*Hargrove I*"). The Court held that Appellants had not demonstrated the ascertainability of the proposed class. In assessing whether class membership could be ascertained from the driver rosters, pay statements, and gate logs, it noted that Sleepy's "acknowledges those records identify the drivers," *id.* at *7, yet held that the available documents did not show which multiple-truck drivers were working on a full-time basis. The Court also noted, notwithstanding Appellants' emphasis on

14

gate logs, they "[were] not fully completed.  Sometimes the time a truck entered the facility (time-in) and the time it left the facility (time-out) [were] not recorded.  As a result, there are gaps in listing time-in or time-out of the facility for the trucks and the drivers."  *Id.*  Additionally, the Court held that it could not ascertain who was a member of the class for the purpose of Appellants' claim for deductions because so many of the carriers were LLCs, stating that there "is no way of knowing . . . whether any carrier reduced any driver[']s pay by deducting Sleepy's listed deductions."  *Id.* at *8.  And the Court stated it could not ascertain the class members who had overtime claims because "there is no way of knowing whether the carrier paid drivers overtime."  *Id.*

### 3.    The Renewed Motion to Certify

Appellants filed a renewed motion for certification of a class of only the 111 individuals who performed deliveries on a full-time basis and who drove one truck for Sleepy's.  Those individuals included 73 drivers who ran only one truck for Sleepy's, and an additional 38 drivers who ran one truck for at least six months even though they operated more than one truck on other occasions.

The District Court denied the renewed motion for class certification in May 2019.  *Hargrove II*, 2019 WL 8881823. First, it construed the motion as a motion for reconsideration. Under the standard of review for reconsideration motions, it would reconsider its prior denial of class certification only if Appellants pointed to "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion . . . ; or (3) the need to correct a clear error of law or fact or to prevent manifest

15

injustice." *Id.* at *3. It ruled that Appellants demonstrated none of these circumstances. *Id.*

The Court nonetheless engaged in the Rule 23 certification analysis, and held that the narrower class was still not ascertainable because the records kept by Sleepy's regarding the identity of the drivers lacked critical information. *Id.* at *6. Much like its February 2018 ruling in *Hargrove I*, it determined that the driver rosters, pay statements, and gate logs failed to show who worked on a full-time basis; thus it was "unable to determine if Sleepy's was the only company the drivers worked for." *Id.* at *5. Additionally, the Court found that the gate logs were not provided for "the full class period," and there was no evidence that those documents existed. *Id.* at *6. Moreover, Appellants could not show "which potential class members were subject to improper deductions and which potential class members worked over forty hours per week without being paid over-time." *Id.* And that "while determining the amount of deductions may be simple based on the [pay statements], the documents still do not allow the Court to determine whether the drivers actually suffered a deduction." *Id.*

Appellants thereafter sought leave to appeal the District Court's denial pursuant to Fed. R. Civ. P. 23(f), and we granted their request.

## II.    ANALYSIS[4]

### A.    Standard Applied to Renewed Motions for Class Certification

Appellants argue that the District Court erred in treating their renewed motion for class certification as a motion for reconsideration, and that it instead should have treated it as an independent motion for class certification.[5]

We have not previously decided what standard applies when reevaluating an initial denial of a motion for certification.

---

[4] The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1332(a), and 1332(d)(2). We have jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f).

[5] Our dissenting colleague would hold that Appellants forfeited the issue of whether the District Court applied the wrong standard of review. Dissent. Op. 1. But the cases he cites involved arguments and issues that were forfeited because they were only raised for the first time in a reply brief, *see Prometheus Radio Project v. FCC*, 824 F.3d 33, 53 (3d Cir. 2016), or only in footnotes, *see John Wyeth & Bro. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997). That is not what we have here. Appellants raised the argument in their opening brief, *see* Hargrove et al. Br. 11 n.12, and then elaborated in detail in their Reply, *see* Hargrove et al. Reply 8–9. And the District Court expressly discussed and ruled on the standard-of-review issue. *Hargrove*, 2019 WL 8881823, at *2–3. *Cf. Lark v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 596, 607 (3d Cir. 2011) (stating that "the crucial question regarding

17

District courts in our Circuit have applied different standards. Some have held that "the best course of action is to treat the present [m]otion like any other for class certification, and to apply the usual Rule 23 standard." *Carrow v. FedEx Ground Package Sys.*, *Inc.*, No. 16-cv-3026, 2019 WL 7184548, at *4 (D.N.J. Dec. 26, 2019). Per Rule 23(c)(1)(C), "[a]n order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). In our case, the Court required Appellants not only to satisfy the requirements of Rule 23, but also to show that (1) there had been "an intervening change in controlling law;" (2) "new evidence" had become available; or (3) there was "the need to correct a clear error of law or to prevent manifest injustice." *Max's Seafood Cafe*, 176 F.3d at 677.

Sleepy's cites a case from the Second Circuit and cases from district courts in our Circuit as support that courts uniformly apply the motion for reconsideration standard, but it mischaracterizes the holdings of those cases. The holding of *In re Initial Public Offering Securities Litigation*, 483 F.3d 70

---

waiver" is whether the proceedings "put the [d]istrict [c]ourt on notice of the legal argument"); *see also Bagot v. Ashcroft*, 398 F.3d 252, 256 (3d Cir. 2005) ("This Court has discretionary power to address issues that have been waived."). There is no argument here that the parties did not have fair notice of this contention, *cf. In re: Asbestos Prod. Liab. Litig. (No. VI)*, 873 F.3d 232, 237 (3d Cir. 2017) (declining to consider argument raised in a footnote because "it fail[ed] to give fair notice of the claims being contested on appeal"), or that Sleepy's did not have an opportunity to respond. Indeed it responded to the standard-of-review argument at length. Sleepy's Br. 18–21.

(2d Cir. 2007), was that district courts may consider a motion to alter or amend a class certification ruling anytime before final judgment, *id.* at 73, and not that those courts should apply the motion-for-reconsideration standard. The Second Circuit specifically noted that "[n]othing in our decision precludes the Petitioners from returning to the District Court to seek certification of a more modest class, one as to which the Rule 23 criteria might be met." *Id.*

Sleepy's also cites *In re Tropicana Orange Juice Marketing & Sales Practices Litigation*, No. 11-cv-7382, 2018 WL 6819331, at *2 (D.N.J. Dec. 28, 2018), but there the Court merely stated that district courts have discretion to consider renewed motions for class certification and not that the reconsideration standard applies; in fact, it applied only the Rule 23 analysis without any reference to the reconsideration standard. *Id.* at *2–3.

District courts outside our Circuit are also split on this issue. *Compare Remington v. Newbridge Sec. Corp.*, No. 13-cv-60384, 2014 WL 505153, at *13 (S.D. Fla. Feb. 7, 2014) (declining to "construe [plaintiff's] renewed request for class certification as one for reconsideration"), *with Torrent v. Yakult U.S.A., Inc.*, No. 15-cv-124, 2016 WL 6039188, at *1 (C.D. Cal. Mar. 7, 2016) (applying the "stringent law of the case standard [for a] motion[] to reconsider" to a renewed motion for class certification) (quoting *Anderson Living Tr. v. WPX Energy Prod., LLC*, 308 F.R.D. 410, 438 (D.N.M. 2015)). But the courts that apply the motion-for-reconsideration standard do so despite the language of Rule 23(c)(1)(C), which states that "[a]n order that grants or denies class certification may be altered or amended before final judgment," their concern being that the parties will be

improperly given a "second bite at the apple" by relitigating the class-certification issue.  *See Anderson Living Tr.*, 308 F.R.D. at 438.

Concern about parties getting a second opportunity, however, cannot override the language of Rule 23(c)(1)(C), which allows for multiple bites at the apple throughout the litigation, and that does not impose an additional requirement on parties to prove a change in law or show new evidence to succeed on a renewed motion for certification.  The Rule does not distinguish between a renewed motion for certification based on new evidence and one based on a more narrow and clearer definition of a class that meets the requirements of Rule 23.  As a practical matter, we know no reason why plaintiffs who can cabin more clearly their class, and meet the other Rule 23 requirements, should be barred from succeeding on a renewed motion.

Accordingly, we decline to import the stringent motion-for-reconsideration standard to a renewed motion for class certification under Rule 23(c)(1)(C).  "[T]he best course of action is to treat [renewed motions] like any other for class certification, and to apply the usual Rule 23 standard." *Carrow*, 2019 WL 7184548, at *4.  Plaintiffs can succeed on a renewed motion for class certification if they more clearly define their proposed class even if there has been no change in the law and no new evidence produced.

The District Court thus erred by treating Appellants' renewed motion for class certification as a motion for reconsideration.  Its application of that standard was not, however, outcome determinative because it still considered the

other Rule 23 criteria and found Appellants' proposed class was not ascertainable. We thus proceed to review that ruling.[6]

"We review a class certification order for abuse of discretion, which occurs if the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Byrd*, 784 F.3d at 161 (citation and internal quotation marks omitted). We review de novo the legal standard applied. *Id.*

## B. Ascertainability

### 1. The Rule 23 Legal Framework

As noted, in our Circuit a Rule 23(b)(3) class must also be "currently and readily ascertainable based on objective criteria." *Marcus*, 687 F.3d at 593. The plaintiff has the burden of making this showing by a preponderance of the evidence, and a district court must "undertake a rigorous analysis of the evidence to determine if the standard is met." *Carrera*, 727 F.3d at 306. However, a plaintiff need not "be able to identify all class members at class certification—instead, a plaintiff need only show that 'class members can be

---

[6] Sleepy's correctly points out that the only order on appeal before us is the District Court's May 2019 order denying Appellants' renewed motion for certification and that Appellants did not seek interlocutory review of the February 2018 order denying their initial motion. However, in the May 2019 order, the Court expressly incorporates portions of the February 2018 order. *See Hargrove II*, 2019 WL 8881823, at *1. We accordingly also review the cited portions of that order.

identified.'"  *Byrd*, 784 F.3d at 163 (emphasis omitted) (quoting *Carrera*, 727 F.3d at 308 n.2).

We have analyzed the ascertainability standard in detail on several occasions.  We first addressed it in *Marcus v. BMW of North America LLC*, in which the plaintiff proposed a class of New Jersey purchasers of BMW vehicles equipped with "run-flat tires" that had "gone flat and been replaced" during the class period.  687 F.3d at 592.  This definition presented serious ascertainability issues.  First, the vehicles were manufactured by a foreign subsidiary who was not a party to the action, so that defendant did not have access to records of which vehicles were equipped with the defective tires.  *Id.* at 593.  Second, dealerships regularly replaced the run-flat tires with regular tires, and the plaintiff did not present a method of obtaining records from individual dealerships.  *Id*. at 593–94.  Finally, the plaintiff limited the class to purchasers of BMWs whose tires had "gone flat and been replaced" and did not propose a method of determining who met this part of the class definition.  *Id*. at 594.  Because the answer to each of these questions was left to "potential class members' say so," we remanded to the District Court to consider "the critical issue of whether the defendants' records can ascertain class members and, if not, whether there is a reliable, administratively feasible alternative."  *Id*.

In *Hayes v. Wal-Mart Stores, Inc*., we considered claims brought by a putative class of New Jersey retail discount club customers who purchased goods with extended warranties.  725 F.3d 349, 352 (3d Cir. 2013).  The proposed class definition included all customers who purchased a "Service Plan to cover as-is products," but it excluded customers whose "as-is product was covered by a full manufacturer's warranty,

was a last-one item . . . who obtained service on their product, and . . . who have previously been reimbursed for the cost of the Service Plan." *Id.* at 353. We noted that this class definition required separate factual inquiries to determine class membership: "(1) whether a Sam's Club member purchased a Service Plan for an as-is item, (2) whether the as-is item was a 'last one' item or otherwise came with a full manufacturer's warranty, and (3) whether the member nonetheless received service on the as-is item or a refund of the cost of the Service Plan." *Id.* at 356. We remanded so that the plaintiff could propose reliable and administratively feasible methods of answering these questions without requiring "extensive and individualized fact-finding." *Id.*

In *Carrera v. Bayer Corp.*, the District Court certified a class composed of all purchasers of a particular over-the-counter diet supplement during several years in Florida. 727 F.3d at 304. Defendants were the drug manufacturers, and they did not have access to any retailer records that could have established which customers purchased the drug during the pertinent time period. *Id.* The plaintiff proposed using "retailer records of online sales and sales made with store loyalty or rewards cards," combined with affidavits from potential class members. *Id.* But the plaintiff had not sought, nor obtained, the proposed records during class discovery. *See id.* at 308–09. We determined that it was inappropriate to certify the class without further inquiry into the nature and extent of the available records. *Id.* at 309. In addition, we noted that, even if the proposed records did exist, there was no evidence that a "single purchaser," let alone the whole class, could be identified using them. *Id.* We remanded so that the plaintiff could conduct additional discovery on whether there

was a reliable and administratively feasible means of determining class membership. *Id.* at 312.

In *Byrd v. Aaron's Inc.*, we considered claims brought by individuals who leased computers with spyware that was installed and activated without their consent. 784 F.3d at 160. The class definition included both the lessees and their household members. *Id.* Defendants kept detailed records enabling identification of the lessees. *Id.* at 169. We concluded that identification of the household members was unlikely to pose "serious administrative burdens that are incongruous with the efficiencies expected in a class action." *Id.* at 170 (quoting *Marcus*, 687 F.3d at 593). "Any form used to indicate a household member's status in the putative class must be reconciled with the 895 known class members or some additional public records." *Id.* at 171.

Most recently, in *City Select Auto Sales Inc. v. BMW of North America*, we vacated and remanded a district court ruling that a proposed class of car dealers who received unsolicited faxes from a credit agent was not ascertainable because a database of the dealers did not list which ones actually received the fax. 867 F.3d at 441. We vacated for two reasons:

> First, our ascertainability precedents do not categorically preclude affidavits from potential class members, in combination with the Creditsmarts database, from satisfying the ascertainability standard. Second, because the Creditsmarts database was not produced during discovery, plaintiff was denied the opportunity to demonstrate whether a reliable, administratively

feasible method of ascertaining the class exists based, in whole or in part, on that database.

*Id.* at 440–41. We emphasized that "[a]ffidavits, in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard," *id.* at 441, and that "[t]he only factual inquiry required to determine class membership is whether a particular dealership in the database received the BMW fax on one of the dates in question," *id*. at 442.[7]

---

[7] Since *Marcus*, judges on our Court have warned that the overzealous application of the "administratively feasible" requirement will defeat the purpose of Rule 23 to protect the rights of individuals who may lack the resources to bring individual claims. Judge Fuentes has pointed out that other Circuits to address ascertainability—including the Second, Sixth, Seventh, Eighth, and Ninth Circuits—have rejected it. *See City Select*, 867 F.3d at 443 n.3, 448 (Fuentes, J., concurring); *see also Byrd*, 784 F.3d 172 (Rendell, J., concurring) ("Our heightened ascertainability requirement . . . narrows the availability of class actions in a way that the drafters of Rule 23 could not have intended."). Some have warned that applying a heightened ascertainability standard could be used to punish plaintiffs where defendants fail to keep accurate records. *Carrera v. Bayer Corp.*, No. 12-2621, 2014 WL 3887938, at *3 (3d Cir. May 2, 2014) (Ambro, J., dissenting from denial of en banc review); *Byrd*, 784 F.3d at 173 (Rendell, J., concurring) (accord). *See also Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1125–26 (9th Cir.) (holding that class proponents were not required to demonstrate that there was an administratively feasible way to

### 2. The District Court Misapplied the Ascertainability Standard

The District Court misapplied our ascertainability case law. It was too exacting and essentially demanded that Appellants identify the class members at the certification stage. But all that is required is that Appellants show there is a "reliable and administratively feasible mechanism," *Byrd*, 784 F.3d at 163 (quoting *Carrera*, 727 F.3d at 306), for determining class membership. They have met that requirement.

Appellants produced evidence that could be used to identify which drivers worked for Sleepy's full time. They produced testimony from a dozen potential class members stating they were required to work exclusively for Sleepy's full-time. It set delivery routes that ran about 10 hours each day. Because of this 10-hour minimum workday, the drivers routinely worked more than 40 hours per week. Appellants produced evidence that the drivers were wholly reliant on Sleepy's for their income and, as a practical matter, were not able to perform deliveries for anyone else.

Moreover, pay statements showed that delivery drivers completed multiple deliveries each day, five to six days a week, and Sleepy's manifests listed the driver of the truck and how many deliveries they were assigned each day. Pay statements also listed amounts that were deducted from the driver's pay, including the reason for the deductions.

---

determine who was in the class for it to be certified), *cert. denied*, 138 S. Ct. 313 (2017).

26

Sleepy's maintained driver rosters listing the names of the individuals who contracted with it; who could drive under their contracts (including the signee and, if the signee had more than one truck, the names of the secondary drivers approved to drive the other trucks who are not members of the proposed class); and how many trucks the driver operated for Sleepy's. Sleepy's security gate logs further show who was driving the truck through the gate each day. Appellants correlated the logs with concurrent pay statements and showed that a driver personally performed deliveries for Sleepy's nearly every day his truck was on the road. Appellants thus identified several distinct data sets that, taken together with the affidavits, establish a "reliable and administratively feasible mechanism" for determining class membership. *Byrd*, 784 F.3d at 163 (quoting *Carrera*, 727 F.3d at 306).

Compare our case to *Marcus*, 687 F.3d 583, and *Carrera*, 727 F.3d 300, where we held the proposed classes were not ascertainable, respectively, because the entities sued were not the ones with the necessary records, and it was not clear that any records existed. In both cases we remanded for the district court to determine further whether there were any records at all. Here we are stacks away from such a dearth of documents. Appellants obtained thousands of records from Sleepy's and have explained how they can use them to identify individual drivers who worked full-time.

We have held that the ascertainability standard was satisfied in cases in which plaintiffs submitted far less evidence than here. In *Byrd*, for example, we held that the household class members were ascertainable even though no evidence as to them had been submitted because we could imagine the

types of evidence that could be identified and used to link the existing class members to household members. 784 F.3d at 170–71. Here we need not use our imagination. We know there are multiple sets of evidence that can be matched with and verified by the putative class members' affidavits. And indeed the District Court used this same set of evidence to determine on the merits that the named plaintiffs were employees.

We made clear in *City Select* that "[a]ffidavits, in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard." 867 F.3d at 441. There we held the class of car dealerships was ascertainable even though the database did not list which dealerships received unsolicited faxes because the database in combination with the potential class members' affidavits would allow the class to be defined. *Id.* at 441–42. So too here.

To be sure, the records Appellants rely on are incomplete. The District Court held that it could not rely on those records to determine which drivers drove full-time. But it failed to explain why, in light of our precedents, the records as a whole, together with the affidavits, did not provide a reliable and feasible mechanism to ascertain class members at the certification stage. Appellants do not have to prove at this stage that each proposed class member was indeed a full-time driver, but only that the members can be identified. *See City Select*, 867 F.3d at 439; *Byrd*, 784 F.3d at 163. Appellants have done exactly that by presenting large samples of Sleepy's driver rosters, gate logs, and pay statements. And the gaps in the record do not undermine the conclusion that all the evidence taken together could at the merits stage be used to

determine who the full-time drivers were.  *See Carrow*, 2019
WL 7184548, at *6 (holding plaintiffs could show which
drivers worked full-time even though they "cannot account for
what each driver was doing during every minute of every day
throughout the class period").  Sleepy's relies on *Carrera* to
argue that Appellants failed to obtain enough documents, but
there the defendant had no records of who purchased the drug
and the plaintiffs failed to seek any records from third parties
or even to show that those records existed.  *See* 727 F.3d at
308–09.  To repeat, Appellants here obtained thousands of
pages of documents.

Many of Sleepy's factual arguments also do not hold up.
For example, it claims that the Outside Carrier Expense Detail
reports and pay statements are not useful because they do not
list the name of the person driving the truck.  But the pay
statements list the driver identification listed in the driver roster
(tied to a known individual) and list what days a driver had a
truck on the road, how many deliveries that truck made, what
the driver was paid, and what deductions were made from the
drivers' pay by Sleepy's and why.  Sleepy's also contends that
the gate logs do not show who actually drove the truck, but
drivers were required to show their Sleepy's identification
badge at a security gate when they arrived at its warehouse and
when they left to make their deliveries after the truck was
loaded, plus the identity of the driver was listed under the
heading "Driver Name." J.A. 880.  Perhaps most audaciously,
Sleepy's suggests that its own driver rosters should be
disregarded because it is unclear that they are accurate.
However, the rosters list the identification numbers assigned to
each driver and that same identification appears on each pay
statement.  And the former dispatch supervisor for Sleepy's
testified that it used Excel worksheets to list the people who

were approved to drive the trucks and whether they were drivers or helpers. She made clear that drivers not approved to make the delivery run would "lose their run" and that only approved drivers appeared on the roster. J.A. 889.

Sleepy's argues as well that which drivers were paid overtime is not ascertainable because it is possible that the corporate entities separately paid their individual drivers overtime and thus complied with New Jersey law. But the deductions they were subject to were discernible from Sleepy's Outside Carrier Expense Detail reports, which show what deductions were made from which trucks. And the exact damages owed each driver is not an ascertainability issue. *See Vaquero v. Ashley Furniture Indus., Inc*., 824 F.3d 1150, 1155 (9th Cir. 2016) (holding that "the need for individual damages calculations does not, alone, defeat class certification").

Sleepy's also points us to evidence that certain individual drivers did not work full time. For example, Brian Martin signed an IDA but he was not a full-time driver for Sleepy's, as his business did not deliver exclusively for it and he rarely drove his own truck. Sleepy's notes that the gate logs Appellants rely on show that Martin was at the Robbinsville facility briefly on certain days, but fail to reflect whether he came to the facility multiple times or made any other deliveries for other customers that day. This misses the point. Martin is no longer part of the proposed class. Appellants concede that not all drivers were full-time drivers for Sleepy's. They have attempted to narrow their class definition to exclude individuals whose record is as incomplete as Martin's. Moreover, even if Martin were still included in the proposed class, it would have been an issue of overbreadth, not ascertainability, in that some drivers who were not full-time

30

drivers would have been included in the proposed class. As we held in *Byrd*, a class can still be ascertainable even if it may be slightly overbroad. 784 F.3d at 168–69. And it is not clear that there is an overbreadth issue with the new proposed class of 111 drivers.

Thus we reverse the District Court's holding with respect to ascertainability. The class members are identifiable through objective criteria—they are listed in Sleepy's contracts, driver rosters, gate logs, pay statements, and other data. Many of the putative class members have been deposed. The District Court improperly focused on perceived gaps in the evidence—gaps that were plausibly created by Sleepy's own record keeping.[8]

---

[8] To be clear, before us is only the May 2019 order denying certification of the class of 111 individuals who performed deliveries on a full-time basis and who drove one truck for Sleepy's. Although the Court incorporated by reference portions of its February 2018 order denying certification of the class of 193, the denial of that certification motion is not before us. So Appellants may move forward with their proposed class of 111.

Additionally, although ascertainability does not stand as a bar to class certification, we express no opinion on whether the other requirements for certification under Rule 23 are satisfied. The District Court did not consider the issue, and we decline to do so in the first instance.

On remand, if the parties further litigate the other requirements of Rule 23 or if they reach the merits, the District Court is of course free to reopen discovery to address gaps in

31

### 3. Employers' Failure to Keep Records as a Roadblock to Class Certification

That the District Court focused on the gaps in the record is especially troubling given that Appellants are only able to rely on the records that Sleepy's kept and produced. We reverse and remand based on the District Court's misapplication of our ascertainability precedent, but we also clarify that where an employer's lack of records makes it more difficult to ascertain members of an otherwise objectively verifiable class, the employees who make up that class will not be made to bear the cost of the employer's faulty record keeping.

To hold otherwise would be in tension with the Supreme Court's decisions in *Mt. Clemens*, 328 U.S. 680, and *Tyson Foods*, 136 S. Ct. 1036, which held that employees' wage claims should not suffer simply due to an employer's failure to maintain employee pay records that it is required to keep by law. In *Tyson Foods*, the Supreme Court explained that the "'remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against making' the burden of proving uncompensated work 'an impossible hurdle for the employee.'" 136 S. Ct. at 1047 (alterations in original) (quoting *Mt. Clemens*, 328 U.S. at 687). Employees can meet their burdens of proof by "produc[ing] sufficient evidence to

_____

the record, especially given that Sleepy's may have more documents that cover a wider timespan. And Sleepy's will in any event at the merits stage be able to present evidence as to any of the 111 drivers to show that he or she was not in fact a full-time driver. But these are questions for a later stage in this litigation, and they do not affect our ascertainability ruling.

show the amount and extent of that work as a matter of just and reasonable inference." *Mt. Clemens*, 328 U.S. at 687. Those inferences are often necessary "to fill an evidentiary gap created by the employer's failure to keep adequate records." *Tyson Foods*, 136 S. Ct. at 1047.

We extend the holdings of *Tyson Foods* and *Mt. Clemens* to the ascertainability determination at the class-certification stage and hold that where an employer has failed to keep records it was required to keep by law, employees can prove ascertainability (it remains their burden) by producing "sufficient evidence" to define their proposed class as "a matter of just and reasonable inference." *Mt. Clemens*, 328 U.S. at 687; *Tyson Foods*, 136 S. Ct. at 1046–47 (holding that plaintiffs may use representative samples to establish "the employees' hours worked in a class action").

For purposes of our case, the New Jersey Wage and Hour Law provides that "[a]ll the time the employee is required to be at his or her place of work or on duty shall be counted as hours worked." N.J. Admin. Code § 12:56-5.2(a). An employer is required to keep accurate records showing the names of its employees, days and hours worked, and other information. N.J. Stat. Ann. § 34:11-56a20; N.J. Admin. Code § 12:56-4.1. Sleepy's thus had an obligation to keep clear employment records. It apparently failed to do so for the members of the proposed class.

Sleepy's argues that it acted in good faith when it failed to keep complete records for the proposed class members because it believed they were independent contractors and not employees. If we accept this argument and allow Appellants' class action to be thwarted by Sleepy's lack of records, we

would be creating an incentive for employers not to keep records and thus avoid potential lawsuits. We thus would be crafting a vast loophole to class certification; employers could simply argue that they believed the potential class members were not employees. This would lead to paradoxical outcomes. *Cf. Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 540 (6th Cir. 2012) ("[C]lass action litigation grows out of systemic failures of administration, policy application, or records management that result in small monetary losses to large numbers of people. To allow that same systemic failure to defeat class certification would undermine the very purpose of class action remedies.").

It cannot be the case that *Mt. Clemens* and *Tyson Foods* do not apply anytime an employer argues workers in good faith were not treated as employees but as independent contractors. If this were so, no court would be able to use those precedents to determine damages where a defendant misclassified its workers as independent contractors or otherwise misclassified employees. We simply follow the path of the Supreme Court that in cases such as this one, where employment records are lacking, the employer and not the employee will bear the cost of such deficiencies, whether they be intentional or good-faith misclassifications. While this does not mean plaintiffs can avoid the ascertainability requirement, it does allow just and reasonable inferences to fill in the gaps in a defendant's faulty record keeping.

\* \* \* \* \*

Accordingly, we reverse the judgment of the District Court and remand this case for further proceedings in accord with this opinion.

HARDIMAN, *Circuit Judge*, dissenting.

"In our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). This assumes that "parties represented by competent counsel know what is best for them, and are responsible for advancing the . . . argument entitling them to relief." *Id.* (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment)) (quotation marks and alteration omitted). So "courts normally decide only questions presented by the parties." *Id.* (quotation marks, citation, and alteration omitted). Because the Majority neglects this principle to reach an issue Appellants failed to raise properly, I respectfully dissent.

Appellants filed a renewed motion for class certification that the District Court construed as a motion for reconsideration. The Court reasoned:

> Plaintiffs must meet a higher standard than before—they must show that either there has been a change in the controlling case law[] (they have not); new evidence is available that was not available when the Court denied the motion (they have not); or the need to correct a clear error of law or fact or to prevent manifest injustice (they have not).

*Hargrove v. Sleepy's LLC*, 2019 WL 8881823, at *7 (D.N.J. 2019). Appellants failed to present the issue of whether the District Court erred in applying this standard. Nevertheless, my colleagues conclude the District Court erred in "treat[ing] the renewed motion for class certification as a motion for reconsideration." Maj. Op. 4–5. They do so apparently based

on a footnote in the procedural history section of Appellants' brief. *See* Hargrove Br. 11 n.12. But we have held that is insufficient to raise an issue or argument. *See, e.g.*, *Prometheus Radio Project v. FCC*, 824 F.3d 33, 53 (3d Cir. 2016) (arguments and issues "relegated to a footnote" are forfeited) (citing *United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005) ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal."), and *John Wyeth & Bro. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived.")). Moreover, Rule 28(a) of the Federal Rules of Appellate Procedure and Rule 28.1(a) of the Third Circuit Local Appellate Rules require appellants "to set forth the issues raised on appeal and to present an argument in support of those issues in their opening brief." *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993).

The Majority contends Appellants did more than raise this issue in a footnote because they "elaborated in detail in their Reply." Maj. Op. 17 n.5. That's not enough. Appellants must present and argue each issue "*in their opening brief*." *Kost*, 1 F.3d at 182 (emphasis added). We have never (until now, apparently) established an exception to this rule where the appellee addresses the issue and the appellant subsequently "elaborate[s]" in the reply brief, or where the parties are not "surprised" because the district court "expressly discussed and ruled on the . . . issue." Maj. Op. 17 n.5. And for good reason. Such an exception will destabilize our forfeiture jurisprudence and undermine our clear and easily administrable rule. It will also invite mischief by permitting appellants to raise issues and arguments summarily in an opening brief, thus forcing appellees to guess at the questions presented and appellant's

specific arguments, before presenting their full argument in a reply brief. This impairs our deliberative process.

The Majority cites several cases it believes support its decision to reach this issue. *Id.* None of them do. It cites *Lark v. Secretary Pennsylvania Department of Corrections*, 645 F.3d 596, 607 (3d Cir. 2011), and *Bagot v. Ashcroft*, 398 F.3d 252, 256 (3d Cir. 2005), which discuss notice in the district court and our discretion to address issues waived below but raised properly on appeal. Neither case supports the Majority's decision because here we deal only with an issue not raised properly on appeal. Next, my colleagues cite *In re: Asbestos Products Liability Litigation (No. VI)*, 873 F.3d 232, 237 (3d Cir. 2017), for their position that we should excuse forfeiture when, despite an appellant's failure to raise an issue properly in accordance with our well-settled precedent and the Federal and Local Rules of Appellate Procedure, the parties nevertheless have fair notice of the claim. In *Asbestos*, as in this appeal, appellants tried to preserve an issue in a footnote while committing their entire opening brief to other issues. We held that an "attempt to shoehorn in an argument" in a footnote is "insufficient to raise an issue on appeal," and that "[a]s a general matter, an appellant waives an argument in support of reversal if it is not raised in the opening brief." *Id.* We should apply the same rule here.

Consistent with our longstanding precedent, I would affirm the District Court and hold that Appellants failed to present and argue the issue of whether the Court erred in

denying their renewed motion for class certification under the motion-for-reconsideration standard.[1]

I also disagree with the Majority's conclusion on the merits. On the record before it, I cannot say the District Court abused its discretion in holding Appellants failed to establish ascertainability.

Appellants failed to show that the class was *currently* and *readily* ascertainable. *See Marcus v. BMW of N. Am. LLC*, 687 F.3d 583, 593 (3d Cir. 2012). They consistently presented a confused and incomplete method for ascertaining class members, which led the Court to its holding on ascertainability. The District Court did not reach this conclusion for lack of trying. It considered substantial briefing, heard argument, and allowed the parties to depose Appellants' key witness when their methodology remained unclear. Despite these

---

[1] Setting aside Appellants' forfeiture, I disagree with my colleagues' broad holding that a district court can never apply the motion-for-reconsideration standard to a renewed motion for class certification. *See* Maj. Op. 5 ("Courts cannot graft . . . the heightened motion-for-reconsideration standard [onto renewed motions for class certification]."). District courts have "ample discretion to consider (or to decline to consider) a revised class certification motion after an initial denial." *In re: Tropicana Orange Juice Mktg. & Sales Practices Litig.*, 2018 WL 6819331, at *2 (D.N.J. 2018) (quoting *In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 73 (2d Cir. 2007)). Because district courts may decline to consider such motions at all, it stands to reason that they retain discretion to apply the reconsideration standard.

opportunities, Appellants failed to establish ascertainability by a preponderance of the evidence.

As just one example of Appellants' shortcomings, consider the gate logs presented (and not presented) at the class certification stage. Appellants have consistently said Sleepy's gate logs are a key component of their ascertainability methodology. *See, e.g.*, App. 1412 (Appellants' witness testified that the only way she could show a particular driver drove on a particular day was by cross-referencing an Outside Carrier Expense Detail report with the gate log). But even after discovery, Appellants failed to obtain gate logs for the full class period. And the logs they presented (from a few months in 2008 and 2009) were missing data. For that reason, the District Court questioned the reliability of those documents in Appellants' ascertainability analysis. And Appellants are to blame for this evidentiary defect because Sleepy's offered to provide all its gate logs but Appellants claimed it was "not [Appellants'] burden to review all of the gate logs . . . prior to class certification." Reply Brief in Support of Plaintiffs' Renewed Motion for Class Certification, Case No. 3:10-cv-01138, ECF No. 225, 11 n.15. So the District Court unsurprisingly concluded Appellants failed to meet their burden for ascertainability given their willful ignorance of the existence and substance of a central category of evidence.

Finally, in reversing the District Court's ascertainability determination, the Majority extends the holdings of *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680 (1946), and *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016). Maj. Op. 6 ("[W]here an employer has failed to keep records it was required to keep by law, employees can prove ascertainability by producing 'sufficient evidence' to define their proposed class as 'a matter of just and reasonable inference.'") (quoting

*Mt. Clemens*, 328 U.S. at 687, and *Tyson Foods*, 136 S. Ct. at 1046–47). I would not apply those precedents to this case because there was never any doubt that the plaintiffs in *Mt. Clemens* and *Tyson Foods* were employees. Here, the company in good faith believed the drivers were independent contractors. The District Court agreed with that classification, and only after the New Jersey Supreme Court held otherwise did they learn that the drivers were employees. *See Hargrove v. Sleepy's LLC*, 2016 WL 8258865, at *1 (D.N.J. 2016); *see also Hargrove v. Sleepy's LLC*, Case Nos. 12-2540 & 12-2541, Petition for Certification of Question of Law ("We believe that this case raises an important issue of New Jersey law that is both determinative and novel.").

For the reasons stated, I would affirm the order of the District Court and respectfully dissent.

OFFICE OF THE CLERK

**PATRICIA S. DODSZUWEIT**

**CLERK**



U̲NITED S̲TATES C̲OURT OF A̲PPEALS
21400 UNITED STATES COURTHOUSE
601 MARKET STREET
PHILADELPHIA, PA 19106-1790
Website: www.ca3.uscourts.gov

TELEPHONE
215-597-2995

October 14, 2020

Mr. William T. Walsh
United States District Court for the District of New Jersey
Clarkson S. Fisher Federal Building and United States Courthouse
402 East State Street
Trenton, NJ 08608

RE: Sam Hargrove, et al v. Sleepys LLC
Case Number: 19-2809
District Court Case Number: 3-10-cv-01138

Dear Mr. Walsh:

Enclosed herewith is the certified judgment together with copy of the opinion in the above-captioned case(s). The certified judgment is issued in lieu of a formal mandate and is to be treated in all respects as a mandate.

Counsel are advised of the issuance of the mandate by copy of this letter. The certified judgment is also enclosed showing costs taxed, if any.

Very truly yours,

s/Patricia S. Dodszuweit,
Clerk

By: Stephanie
Case Manager
267-299-4926

cc: All Counsel of Record